IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                        Criminal Case No. ELH-12-401

SUSAN A. PRATT

**MEMORANDUM OPINION**

By way of a Second Superseding Indictment (ECF 53), the government has charged

Susan A. Pratt with multiple counts of unlawful receipt by a public official of items "of value" in

connection with official acts, in violation of 18 U.S.C. § 201(c)(1)(B) (the "gratuity" counts),

and receipt of illegal supplementation of salary from a non-governmental source, in violation of

18 U.S.C. § 209(a) (the "salary supplementation" counts). Ms. Pratt filed a "Motion to Dismiss

Indictment" ("First Motion to Dismiss") (ECF 14), seeking dismissal of the gratuity counts

(Counts One, Two, Three, Five, Seven, and Nine), and a "Motion to Dismiss Counts Four, Six,

Eight, and Ten of the Superseding Indictment" ("Second Motion to Dismiss") (ECF 31), with

respect to the salary supplementation counts (collectively, the "Motions to Dismiss").[1] Ms. Pratt

also filed three motions for bills of particulars, *see* ECF 15, 30, 50, some of which were decided

by prior orders of the Court or rendered moot by further disclosures from the government. And,

Ms. Pratt filed a "Motion to Suppress Statements" (ECF 16), on the basis of *Miranda v. Arizona*,

384 U.S. 436 (1966), and its progeny.

---

[1] Although the Motions to Dismiss were filed before the Second Superseding Indictment
was returned, I have considered the arguments contained in the motions as if they were addressed
to the Second Superseding Indictment, because the Second Superseding Indictment did not
render the arguments moot.

On January 10, 2013, I held a hearing to address the various defense motions.  Thereafter, I denied defendant's suppression motion and her third motion for bill of particulars, for reasons stated on the record, and took the Motions to Dismiss under advisement.  *See* ECF 59.  For the reasons that follow, I shall deny the Motions to Dismiss.

## Background

At all relevant times, Ms. Pratt was employed by the Federal Bureau of Prisons ("BOP"), an agency of the United States Department of Justice.  In particular, Ms. Pratt was a Supervisory Traffic Management Specialist in the Relocation Services Section ("Relocation Services") of the BOP.  Relocation Services is responsible for coordinating moving services and moving expenses for BOP employees when they are transferred from one duty station to another.  As Supervisory Traffic Management Specialist, Ms. Pratt was responsible for various aspects of the selection, reimbursement, and evaluation of private carriers employed by Relocation Services to transport the household goods of relocating BOP employees.

The government alleges that, on several occasions, Ms. Pratt accepted items of value from certain private moving carriers who transacted business with Relocation Services, including free moving services for herself and for a friend; spa services; a gift certificate for spa services; and lunch at a restaurant.  According to the government, Ms. Pratt's conduct violated the criminal statutes cited above.

As to the gratuity counts, 18 U.S.C. § 201(c)(1)(B) prohibits a federal public official from "directly or indirectly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value personally *for or because of any official act performed or to be performed by such official or person*."  (Emphasis added).  The term "official act" is defined in

18 U.S.C. § 201(a)(3), as follows:  "[T]he term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  *See United States v. Jefferson*, 674 F.3d 332, 351-58 (4th Cir.) (holding that "official acts" encompass all activities within the range of one's official duties, although not every act taken in one's official capacity) (citing, *inter alia*, *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999); *United States v. Birdsall*, 233 U.S. 223 (1914); and *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007)), *cert. denied*, 133 S. Ct. 648 (2012).  Each gratuity count carries a penalty of up to two years' imprisonment.

As to the salary supplementation counts, the government charges Ms. Pratt with the violation of 18 U.S.C. § 209(a), which prohibits a federal officer or employee, with exceptions not applicable here, from "receiv[ing] *any salary, or contribution to or supplementation of salary*, as compensation for [her] services as [a federal officer or employee], from any source other than the Government of the United States . . . ."  (Emphasis added.)  Pursuant to 18 U.S.C. § 216(a), a violation of the salary supplementation statute is a misdemeanor, subject to imprisonment for no more than one year, unless the violation is performed "willfully," in which case it is a felony, subject to imprisonment for up to five years.  In this case, each of the salary supplementation counts alleges a willful violation.

Over the course of pretrial proceedings, the government has refined its charging strategy. In the original Indictment (ECF 1), the government charged Ms. Pratt with six counts under the gratuity statute, without any salary supplementation charges.  In a Superseding Indictment (ECF 21), the government added four counts under the salary supplementation statute, bringing the

total number of counts to ten.  In the Second Superseding Indictment (ECF 53), which is the operative charging document, the government reasserted the same ten counts, buttressed with additional factual allegations.[2]

The Motions to Dismiss filed by Ms. Pratt challenge the facial sufficiency of the Indictment.  A "challenge to the sufficiency of the indictment . . . is ordinarily limited to the allegations contained in the indictment."  *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).  Accordingly, the facts set forth in this Background section are drawn from the allegations of the Indictment, unless otherwise noted.

The Indictment contains several allegations concerning Ms. Pratt's job responsibilities as they related to the companies employed to move the household belongings of BOP employees. According to the Indictment, as Supervisory Traffic Management Specialist, one of Ms. Pratt's responsibilities was to prepare a "Household Goods Carrier Selection Form" ("Carrier Selection Form") for each relocating BOP employee.  Indictment ¶ 4. She did so by "enter[ing] the origin, destination, date, and estimated household goods weight" applicable to the planned move into an "online system" called the "Transportation Management Services Solution" ("TMSS"), maintained by the United States General Services Administration ("GSA"), which provides an automated means of matching private carriers with a particular federal employee's move.  Based on the origin, destination, date, and estimated household goods weight for a particular move, the TMSS system produces a list, "ranked by pricing and service score," of all of the "carriers that [a]re qualified to provide the move."  *Id.*

---

[2] Hereafter, I will refer to the Second Superseding Indictment as the "Indictment," unless clarity otherwise requires.  I will refer to the original Indictment as the "Original Indictment."

The Indictment alleges that, for a given BOP employee's move, Ms. Pratt would select up to five carriers from the ranked TMSS list to be included on the Carrier Selection Form; the Carrier Selection Form would then be provided to the relocating BOP employee, who ordinarily would choose his or her carrier from the list provided by Ms. Pratt.[3]  *Id.*  According to the Indictment, each time Ms. Pratt "placed a carrier on the Carrier Selection Form, she helped that carrier."  *Id.*  Moreover, the Indictment alleges that, on some occasions, Ms. Pratt "included on the Carrier Selection Form not only the national carrier listed on the TMSS system, but also a company which served as the local agent for the carrier."  *Id.* ¶ 5.  The local agents "did not appear on the TMSS print out."  *Id.*  Thus, the government maintains that each time Ms. Pratt added the name of a local agent onto the Carrier Selection Form, her "inclusion of the local agent company helped the local agent company."  *Id.*

The BOP pays each carrier "for the total cost of the move within the terms of the GSA-carrier contract."  *Id.* at 6.  In this regard, Ms. Pratt's responsibilities included reviewing and approving the bill of lading for each move, as well as reviewing and approving any "extra costs" or "subsequent amendments to the bills of lading."  *Id.*  In addition, Ms. Pratt was required to field "inquiries from carriers who had performed moves for relocating BOP employees but whose invoices had not yet been paid."  *Id.* ¶ 8.  "When she assisted in resolving these unpaid invoices," according to the Indictment, Ms. Pratt "helped the carrier."  *Id.*

---

[3]  In her First Motion to Dismiss, Ms. Pratt asserted that a BOP employee also was entitled to "select his/her own mover so long as the mover was willing to do the work for the sum allotted by the BOP."  ECF 14 at 2.  In the government's Response to Defendant's Pre-Trial Motions (ECF 24), the government suggested that sometimes Ms. Pratt identified fewer than five carriers on the Carrier Selection Form, and that a relocating BOP employee would sometimes "contact[ ] the defendant to discuss the different movers and the mover-selection process."  ECF 24 at 2.  None of these allegations are contained in the Indictment, however.

In addition, Ms. Pratt was responsible for evaluating the carrier for each move. *Id.* ¶ 7. She did so by grading the carrier on GSA Form 3080, the "Household Goods Carrier Evaluation Report" ("Form 3080"). *Id.* The relocating BOP employee would also grade the carrier on the Form 3080. *Id.* Ms. Pratt would then transmit the completed Form 3080 to GSA. *Id.* GSA uses "the Form 3080 scores in ranking carriers and determining which carriers [a]re eligible to provide household good moves for government employees." *Id.* The Indictment also alleges that, on some occasions, Ms. Pratt provided "recommendation letters to carriers who were pursuing work with other government agencies." *Id.*

The Indictment identifies six specific occasions when Ms. Pratt allegedly received or solicited something of value from a carrier or a carrier's agent and employees. These six occasions form the basis of the ten counts. Although the counts are not presented in chronological order in the Indictment, I will summarize them chronologically here.

First, on July 28, 2007, Ms. Pratt allegedly accepted spa services at Robert Andrews Salon and Spa (the "Andrews Salon") and lunch at the 4 Seasons Grille, both located in Gambrills, Maryland, from "J.M.M." (a company that is a carrier and an agent for "M.T." van line), J.M.M.'s president, and one of its employees. This incident forms the basis of Count Two (alleging a violation of the gratuity statute).

Next, on December 14, 2007, Ms. Pratt allegedly accepted a gift certificate to the Andrews Salon from "K.M.S.," another carrier and agent for M.T. van line, and certain K.M.S. employees.[4] This incident forms the basis of Count Three (alleging violation of the gratuity statute) and Count Four (violation of the salary supplementation statute).

_____

[4] In the Government's Response to the First Motion to Dismiss (ECF 24), it asserts that

Soon after, on December 23, 2007, Ms. Pratt allegedly accepted additional spa services at the Andrews Salon, courtesy of the J.M.M. company, as well as its president and one of its employees.  This forms the basis of Count Five (violation of the gratuity statute) and Count Six (violation of the salary supplementation statute).

Days later, on December 29, 2007, Ms. Pratt allegedly accepted a free move of her household goods from one residence to another in Crofton, Maryland, from "A.R.S.," which is a carrier and agent for another company ("A.V.L."), and one of A.R.S.'s employees.  This forms the basis of Count Seven (violation of the gratuity statute) and Count Eight (violation of the salary supplementation statute).

On May 22, 2010, Ms. Pratt allegedly accepted a move of household goods from Elkton, Maryland to Newark, Delaware for C.F., a friend of Ms. Pratt, from the company "W.N.A." (a carrier and agent for a large national carrier named "N.A." van line) and certain W.N.A. officers and employees.  This forms the basis of Count One (alleging a violation of the gratuity statute).

Finally, on October 9, 2010, Ms. Pratt allegedly accepted spa services at the Andrews Salon courtesy of the company J.M.M., its president, and one of its employees.  This forms the basis of Count Nine (violation of the gratuity statute) and Count Ten (violation of the salary supplementation statute).

---

K.M.S. and its employees gave Ms. Pratt gift certificates to the Andrews Salon on two occasions: on January 3, 2006 (in the amount of $1,007) and on December 14, 2007 (in the amount of $790).  The alleged incident of January 3, 2006, has not been charged in the Indictment.  Given that the Original Indictment was returned on July 24, 2012, the January 2006 incident was presumably omitted because it was outside the general five-year statute of limitations for federal crimes.  *See* 18 U.S.C. § 3282(a).  In light of the Government's disclosure of the date and amount of the gift certificate of December 14, 2007, I ruled previously that one aspect of Ms. Pratt's first motion for bill of particulars (ECF 15) was moot.  *See* ECF 36.

In addition to charging the foregoing six specific occasions on which Ms. Pratt allegedly received particularized items of value from carriers, and in addition to describing Ms. Pratt's job responsibilities, as discussed above, the government has asserted that, on each occasion when Ms. Pratt performed those job responsibilities in a manner favorable to any given carrier, she "helped that carrier."  Indictment ¶ 4; *see also id.* ¶¶ 5 & 8.  However, the Indictment does not identify any specific instance when Ms. Pratt performed her job responsibilities in a manner favorable to any of the carriers who allegedly gave her things of value.  Nor does the Indictment expressly articulate a connection between any item of value that Ms. Pratt accepted and any particular action that she took or did not take in the performance of her duties.  Rather, each gratuity count in the Indictment alleges that Ms. Pratt accepted the item of value in question "for and because of official acts performed and to be performed" by Ms. Pratt.  And, each of the salary supplementation counts alleges that, by receiving the item of value at issue, Ms. Pratt "willfully received a contribution and supplementation to her salary as compensation for her services as a Supervisory Traffic Management Specialist for the BOP from a source other than the U.S. government."  In other words, the counts track the language of the statutes.

**Discussion**

<u>A.</u>

An indictment implicates a defendant's constitutional due process right to reasonable notice of the charges.  *See, e.g.*, *Stroud v. Polk*, 466 F.3d 291, 296 (4th Cir. 2006).  "To pass constitutional muster, an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy

in subsequent prosecutions for the same offense." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998); *accord Hamling v. United States*, 418 U.S. 87, 117 (1974).

Rule 7(c)(1) of the Federal Rules of Criminal Procedure governs the required contents and form of an indictment.  It provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."

In *United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002), the Fourth Circuit articulated the standard for sufficiency of an indictment:

> "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Usually "an indictment is sufficient if it alleges an offense in the words of the statute," as long as the words used in the indictment "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence."  However, simply parroting the language of the statute in the indictment is insufficient.  When the words of a statute are used to describe the offense generally, they "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."  Thus, the indictment must also contain a "statement of the *essential facts* constituting the offense charged."

*Id.* at 310 (internal citations omitted) (emphasis in *Brandon*).

According to Ms. Pratt, the Indictment is deficient because it fails to allege an essential element of a crime under both the gratuity statute and the salary supplementation statute, and because it fails to provide adequate notice of the nature of the charges.  In particular, as to the gratuity counts, defendant contends that the Indictment does not state with sufficient particularity the "official acts" for which she allegedly received gratuities.  Put another way, she claims that the Indictment does not adequately allege a connection between the gratuities Ms. Pratt purportedly received and any particular "official act" that she performed.  As to the salary

supplementation counts, Ms. Pratt argues that the Indictment does not charge a crime because the gift certificates and in-kind services she allegedly received do not qualify as "salary" or "contribution to or supplementation of salary" within the meaning of the statute.

There is limited case law concerning the gratuity statute and the salary supplementation statute. And, the judicial decisions that have interpreted these two statutes (none of which emanate from the Fourth Circuit) are not all in agreement. As to each statute, I find the government's interpretation somewhat overbroad and the defendant's interpretation unduly narrow. Mindful of the limited scope of a challenge to the sufficiency of an indictment, I will deny both Motions to Dismiss.

### B.

Ms. Pratt's challenge to the gratuity counts is based primarily on *United States v. Sun-Diamond Growers of California*, *supra*, 526 U.S. 398 (1999), the leading Supreme Court case concerning the gratuity statute. In *Sun-Diamond*, the United States prosecuted a trade association for allegedly making illegal gifts to Mike Espy, then the Secretary of Agriculture.[5] Writing for a unanimous Court, Justice Scalia concluded that the trial court improperly instructed the jury as to the gratuity statute by stating that the trade association violated the statute if it gave a gratuity to Secretary Espy simply "because of his official position." *Id.* at 405. According to the *Sun-Diamond* Court, the trial court erred in its instructions by suggesting that the gratuity statute "did not require any connection between [the trade association's] intent and a specific

---

[5] The gratuity statute contains complementary provisions prohibiting both the giving of gratuities to a public official, *see* 18 U.S.C. § 201(c)(1)(A), and, as here, the receipt of gratuities by a public official. *See* 18 U.S.C. § 201(c)(1)(B). The salary supplementation statute also contains dual, complementary prohibitions of both gift and receipt of salary from a nongovernmental source. *See* 18 U.S.C. § 209(a).

official act," such that it "would be satisfied . . . merely by a showing that [the trade association] gave Secretary Espy a gratuity because of his official position—perhaps, for example, to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." *Id.* at 405.  The Court held, instead, that to establish a violation of the gratuity statute "the Government must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414. Justice Scalia remarked: "The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved." *Id.* at 406.  *Sun-Diamond* is discussed further, *infra*.

Here, the defense complains that the Indictment merely alleges generally the types of official acts for which Ms. Pratt was responsible, but fails to identify a particular official act that Ms. Pratt performed or was to perform.  Moreover, defendant maintains that the Indictment does not articulate the purported connection between the alleged gratuities and defendant's official acts.  In Ms. Pratt's view, the Indictment fails to provide adequate notice of the crime charged because, out of the many official acts she regularly performed, it does not identify the particular official acts that are the subjects of the charges.

In support of the sufficiency of the gratuity counts, the government suggests that defendant places too much reliance on *Sun-Diamond*.  First, the government accurately observes that *Sun-Diamond* did not concern the sufficiency of an indictment; rather, the issue was whether the trial court's jury instructions accurately stated the law.[6]  Second, the government views the

_____

[6] The trial court in *Sun-Diamond* had denied a pretrial motion to dismiss the indictment, on the basis of the proposition that it was not necessary for the indictment to "'allege a direct nexus between the value conferred to Secretary Espy by Sun-Diamond and an official act

decision in *Sun-Diamond* as animated by the trial court's erroneous assertion in that case that no link whatsoever between gratuities and official acts needed to be alleged or proven. In contrast, the government posits, it has alleged in the Indictment that each gratuity was given to Ms. Pratt "for or because of an official act," using the language of the statute. Third, the government faults Ms. Pratt for "inaccurately equat[ing] herself and her position with the Secretary of Agriculture and his position." ECF 24 at 13. As the government sees it, the connection between Ms. Pratt's official acts and her receipt of gratuities is obvious because, unlike the Secretary of Agriculture in *Sun-Diamond*, who had authority over "broad policy or budgetary determinations," essentially everything Ms. Pratt did "was a concrete decision or action affecting pending matters that were important to the moving companies with whom she worked." *Id.* at 14.

As its fourth and final sally against Ms. Pratt's challenge to the gratuity counts, the government accuses Ms. Pratt of attempting to hold the gratuity charges to the higher burden of pleading the more serious offense of bribery under 18 U.S.C. § 201(b)(2), with which Ms. Pratt has not been charged. Bribery carries a potential sentence of up to fifteen years' imprisonment, far more than the gratuity statute. *See id.*

---

performed or to be performed by Secretary Espy.'" *Sun-Diamond*, 526 U.S. at 402-03 (quoting trial court). Rather, the trial court had ruled that it was "'sufficient for the indictment to allege that Sun-Diamond provided things of value to Secretary Espy because of his position.'" *Id.* (quoting trial court). The indictment had "alluded to two matters in which [the trade association] had an interest in favorable treatment from the Secretary at the time it bestowed the gratuities," *id.* at 401, but "did not allege a specific connection between either of them—or between any other action of the Secretary—and the gratuities conferred." *Id.* at 402.

Although the Supreme Court expressly declined to rule on the sufficiency of the indictment, "an issue on which certiorari was neither sought nor granted," the *Sun-Diamond* Court intimated that its decision "cast[ ] doubt" on whether the district court had ruled correctly in denying the motion to dismiss the indictment. *Id.* at 414. The Court stated that the sufficiency of the indictment remained open for reconsideration on remand. *Id.*

Under the bribery statute, a government official may not "directly or indirectly, *corruptly* demand[ ], seek[ ], receive[ ], accept[ ], or agree[ ] to receive or accept anything of value personally *or for any other person or entity*, *in return for*," *inter alia*, "being *influenced in the performance of any official act*."   18 U.S.C. § 201(b)(2) (emphasis added to highlight distinctions between bribery and gratuity).   In *Sun-Diamond*, 526 U.S. at 404-05, the Court summarized the distinction between the bribery and gratuity statutes, both of which are contained in 18 U.S.C. § 201:

> Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act.  In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act.  An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken. (Emphasis in original.)

In the government's view, by demanding that the government allege an express, particularized linkage between gratuities received and individual official acts, Ms. Pratt is insisting that the government charge the *quid pro quo* that is the hallmark of the bribery statute but is not necessary to a charge or conviction under the gratuity statute.

I am persuaded that the Indictment is sufficient to allege unlawful receipt of gratuities. To be sure, the Supreme Court could not have spoken more clearly in *Sun-Diamond* when it stated, in regard to the gratuity statute, that a gift given only "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future," without being "connected to a particular official act," does not violate the gratuity statute.  *Id.* at 406.  *Sun-Diamond* underscored that, "in order to establish a violation of 18 U.S.C. § 201(c)(1) . . . the Government must prove a link between a thing of value conferred upon a public official

and a specific 'official act' for or because of which it was given." *Id.* at 414.  Therefore, to prove

a violation of the gratuity statute, the government must do more than show that gifts were given

to the defendant because she was "'in a position to act favorably to the giver's interest,'" or

because she had the "'capacity to exercise governmental power or influence in the donor's

favor.'"  *Id.* at 405 (emphasis omitted) (quoting and rejecting government's position).  *See*

*United States v. Hoffmann*, 556 F.3d 871, 875 (8th Cir. 2009) (quoting a jury instruction on the

gratuity statute that "accurately explained the government's burden to establish a link between

the [thing of value] and an official act," and which was entirely consistent with the foregoing

quotes from *Sun-Diamond*).

The issue here, however, does not concern the sufficiency of proof at trial.  Rather, the

issue concerns the sufficiency of the Indictment.  In resolving the parties' contentions as to the

sufficiency of the gratuity counts, I draw guidance from the Fourth Circuit's decision in *United*

*States v. Quinn*, 359 F.3d 666 (4th Cir. 2004).  Although it was not a gratuity case, the decision

concerned the sufficiency of an indictment with regard to the related offense of bribery.

As noted, a key distinction between gratuity and bribery is that, in the case of bribery, the

prosecution must prove "a *quid pro quo*—a specific intent to give or receive something of value

*in exchange* for an official act."  *Sun-Diamond*, 526 U.S. at 404-05 (emphasis in original).  In

*Quinn*, the Fourth Circuit considered whether an indictment "failed to allege with sufficient

particularity that [defendants] intended to effect an exchange of a specific payment for specific

official action."  *Quinn*, 359 F.3d at 672.  Because the defendants had not moved to dismiss the

indictment on that ground before trial, the appellate court reviewed the claim only for plain error.

*Id.* Relying upon the definition of a *quid pro quo* taken from *Sun-Diamond*, as well as pre-*Sun-Diamond* case law concerning the bribery statute, the *Quinn* Court said, *id.* at 673:

> We have stated that the government is not required in a bribery case to prove "an expressed intention (or agreement) to engage in a quid pro quo." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). Nor must the government prove "that the defendant intended for his payments to be tied to specific official acts (or omissions). . . . Rather, it is sufficient to show that the payor intended for each payment to induce the official to adopt a specific course of action." *Id.* In other words, "[t]he quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." *Id.* (internal quotations omitted). . . . Thus, an indictment charging solicitation of bribery in violation of § 201(b) should allege that (1) the defendant was a government official, (2) who sought something of value from another person, (3) in exchange for favorable official action or inaction by the defendant. (Emphasis in *Quinn*.)

Applying those standards, the Fourth Circuit held that the indictment was sufficient where it alleged that the defendant public officials "'sought . . . benefits [from particular persons or entities] in return for favorable consideration and recommendation on specified future contracts with the Treasury Department,'" and that defendants "'would solicit employment and other financial benefits from third parties in exchange for offering to award future potential government contracts.'" *Quinn*, 359 F.3d at 673 (quoting indictment). The *Quinn* Court stated that such allegations, "taken together, identif[ied] the relevant parties and the purported quid pro quos," and put defendants "on notice that they were charged with seeking . . . direct compensation to [one of the defendants] (in the form of employment) in exchange for favorable consideration on a government contract." *Id.* at 674. In its view, the allegations were also "sufficiently specific to bar a future prosecution for the same offenses," and thus adequately alleged the crime of bribery.

Under *Quinn,* the allegations here of illegal receipt of gratuities are sufficient to withstand the First Motion to Dismiss.  The Indictment clearly articulates the things of value that Ms. Pratt allegedly received and the dates on or about which she allegedly received them.  Such allegations are sufficiently specific, in my view, to bar future prosecution for the same offenses.

I am mindful that, as noted, Ms. Pratt takes issue with the Indictment in regard to the "official acts" for which the gratuities allegedly were given.  Ms. Pratt is correct that the Indictment does not identify particular or specific official acts that she took or was to perform.  Rather, it alleges several categories of official acts that came within Ms. Pratt's specific job responsibilities.[7]  But, *Quinn* dictates that the allegation of the general types of official acts is sufficient to allege the crime.  Interpreting the bribery statute, which requires the prosecution ultimately to prove a more concrete connection between gifts and official acts, the *Quinn* Court upheld the sufficiency of an indictment that, without more, described the official acts at issue as "'favorable consideration and recommendation on specified future contracts with the Treasury Department.'"  *Quinn*, 359 F.3d at 673 (quoting indictment).  If anything, the Indictment here provides greater detail than the indictment in *Quinn*.

I pause to note that, at the motions hearing, the government seemed to suggest that, because the gratuity statute prohibits gifts given in connection with an official act "performed *or to be performed*" by a public official, 18 U.S.C. § 201(c)(1)(B) (emphasis added), identification

---

[7] The defense does not appear to argue that defendant's job responsibilities, as described in the Indictment, failed to satisfy the definition of "official acts" in the gratuity statute.  In any event, the job duties described in the Indictment are the kinds of conduct that qualify as "official acts" under the statutory definition in 18 U.S.C. § 201(a)(3).

of a specific, discrete future act is not necessary.[8]  But, the *Sun-Diamond* Court made clear that

this broad scope as to the *timing* of an official act does not alter the requirement as to proof of an

official act: the Court defined an illegal gratuity as "a reward for some future act that the public

official will take (and may already have determined to take), or for a past act that he has already

taken."  *Sun-Diamond*, 526 U.S. at 405.  In other words, the "uncertainty of future action" did

not dilute the requirement to prove a connection to an official act (either an act that was merely

anticipated or that ultimately came to fruition).  *Id.* at 408.  The Court provided an example of a

situation in which a gratuity might be paid in connection with a future official act, but not

involve the *quid pro quo* necessary for bribery, stating: "If, for instance, a large computer

company makes a gift to a person who has been chosen to be Assistant Attorney General for the

Antitrust Division of the Department of Justice and who has publicly indicated his approval of

the merger, it would be quite possible for a jury to find that the gift was made 'for or because of'

the person's anticipated decision, once he is in office, not to challenge the merger."  *Id.*; *see also*

*United States v. Ahn*, 231 F.3d 26, 31 (D.C. Cir. 2000) ("[A]n illegal gratuity 'can take one of

three forms': (1) a reward for past action, (2) an enticement to maintain a position already taken,

or (3) an inducement to take or refrain from some future official action.") (citation omitted).

---

[8] Similarly, in its briefing, the prosecution seemed to contend that identifying the broad types of acts that comprise the job duties of a public employee (especially an employee with well-defined job responsibilities, like Ms. Pratt) would be all that is necessary to carry its burden of proof at trial, and that *Sun-Diamond*'s admonition that the gratuity statute is not violated when a gift is given merely "because of [the] official['s] position," 526 U.S. at 405, does not apply to non-policymaking employees such as Ms. Pratt.  *See* ECF 24 (arguing that Ms. Pratt "inaccurately equates herself and her position with the Secretary of Agriculture and his position").  The Supreme Court in *Sun-Diamond* gave no indication that it intended its interpretation of the gratuity statute to be confined to policymaking officials.

Here, the Indictment alleges the elements of the crime of receiving an illegal gratuity, for or because of an official act, and describes generically the types of official acts at issue. It also gives the defendant sufficient factual information regarding the allegations, so as to protect against double jeopardy. Therefore, I will deny the First Motion to Dismiss.

I turn to the Second Motion to Dismiss, which concerns the salary supplementation counts.

## D.

With respect to the salary supplementation counts, as noted, the defense argues that the types of gifts allegedly given to Ms. Pratt that form the basis of those counts—specifically, a free move of household goods provided to Ms. Pratt, a $790 gift certificate to a spa and salon, and two occasions on which a moving carrier and its employees treated Ms. Pratt to spa and salon services—do not qualify as "salary" or supplementation of "salary" within the meaning of the statute. Ms. Pratt's argument as to the salary supplementation counts is based on the concurring opinion by Justice Scalia in *Crandon v. United States*, 494 U.S. 152, 168-84 (1990) (Scalia, J., concurring). There, writing for himself and Justices Kennedy and O'Connor, Justice Scalia joined the majority in holding that the evidence in that case was insufficient to establish a violation of the salary supplementation statute, but "[f]or a different reason, unaddressed by the [majority opinion of the] Court." *Id.* at 171.

The payments at issue were one-time, lump-sum "severance" payments made by the Boeing Company to five executives who resigned their positions at Boeing to take "important positions in the Executive Branch of the Federal Government" at lower pay than their private-sector income. *Id.* at 154 (majority op.). The majority held that the payments did not violate the

salary supplementation statute because the payments were made before the executives actually entered into government employment. *See id.* at 159. Justice Scalia rejected the majority's reasoning, believing that "payments which are made before or after the term of federal employment are [not] necessarily excluded" from the salary supplementation statute. *Id.* at 168 (Scalia, J., concurring). Nevertheless, Justice Scalia joined the majority's judgment that the statute had not been violated because, in his view, one-time, lump-sum payments, "neither made periodically during the term of federal service, nor calculated with reference to periodic compensation," were outside the ambit of the salary supplementation statute. *Id.* at 168-69.

Justice Scalia reasoned that, because the statute is phrased in terms of "salary," it connotes receipt of "periodic payments as compensation." *Id.* at 172. He maintained that "to 'receive contribution to or supplementation of salary as compensation' is to receive contribution to or supplementation of periodic payments, in the sense that the contribution or supplementation itself must be periodic." *Id.* Justice Scalia based his analysis on the statutory text, opining that "[s]alary is not the same as compensation, but is one species of that genus," and that "to regard any single payment from a nongovernment source as a 'contribution to or supplementation of salary' . . . is to render all the references to salary [in the statutory text] superfluous, so that the statute might as well have prohibited . . . all 'compensation.'" *Id.* His conclusion was buttressed by application of the rule of lenity, *see id.* at 175, as well as an analysis of the historic context in which the salary supplementation statute was enacted, *see id.* at 175-76, and a review of the lengthy and inconsistent history of interpretation of the statute by the Executive Branch. *See id.* at 177-83.

Ms. Pratt acknowledges, of course, that Justice Scalia's views in *Crandon* did not command a majority of the Court and thus are not binding precedent.  But, she posits that this Court should find the *Crandon* concurrence persuasive, given that it constitutes the considered view of three Supreme Court justices and is one of the most detailed explications of the salary supplementation statute in the case law.  She also points to some federal appellate decisions that have adopted a similar view of the statute.  *See, e.g.*, *United States v. Alfisi*, 308 F.3d 144, 153-54 (2d Cir. 2002) (stating that, under the salary supplementation statute, "the payments in question must bear some or most of the objective indicia of salaries, e.g., being so recorded in business records and so treated for tax purposes by the payor").

Relying on *Crandon*, Ms. Pratt maintains that occasional in-kind gifts simply do not qualify as supplementation of "salary" under the statute.  Moreover, she argues that, although some courts have found lump-sum monetary payments to violate the statutory supplementation statute, the gifts of in-kind services, such as the moving services and spa treatments at issue here, are even less salary-like, because they are not monetary.

In response, the government contends that the Indictment is presumptively sufficient because it alleges all elements of salary supplementation and identifies the items of value that Ms. Pratt allegedly received in supplementation of her salary.  Therefore, the government argues that dismissal would be tantamount to "rejecting the grand jury's indictment based on little more than defendant's assertion that the benefits she received do not 'feel' like salary."  ECF 45 at 3.  Moreover, the government simply rejects the reading of the statute offered by Justice Scalia in his *Crandon* concurrence, upon which defendant relies.  It points to decisions of lower courts that have expressly reached the opposite conclusion and concluded that one-time, lump-sum

payments may be salary.  *See, e.g.*, *United States v. Project of Government Oversight*, 616 F.3d

544 (D.C. Cir. 2010) ("*POGO*"); *United States v. Gerdel*, 103 F. Supp. 635 (E.D. Mo. 1952).

In *POGO*, the D.C. Circuit expressly disagreed with the *Crandon* concurrence, and held

that lump-sum payments were covered by the salary supplementation statute.  *See POGO*, 616

F.3d at 560-61.  As a textual matter, the *POGO* Court reasoned that the statute bars payment of

"salary," but it "also bars the payment of 'any contribution to or supplementation of salary.'"  *Id.*

at 560 (quoting 18 U.S.C. § 209(a)).  According to the court, the "prohibition of a contribution or

supplementation plainly goes beyond a salary, and the introductory adjective 'any' expands the

scope of coverage still further."  *Id.*  Moreover, the D.C. Circuit observed that other subsections

of 18 U.S.C. § 209 carve out exceptions from liability under the broad prohibition of salary

supplementation in § 209(a), and several of those subsections expressly address payments "that

are typically lump-sum, or at least not periodic," which suggests that non-periodic payments

otherwise are within the statute's ambit.[9]  *Id.*  Moreover, the *POGO* Court opined, *id.*:

> Nor do we think it likely that Congress would have wanted to bar small but periodic payments intended to compensate an employee for his government services, but to permit large single—or irregular—payments that total a far greater sum.  If the statute is intended to prevent the appearance of wrongdoing, as the Supreme Court has repeatedly declared, it is hard to see why the public would regard the former as worse than the latter.

Similarly, the district court in *Gerdel*, reviewing the prior codification of the salary

supplementation statute, stated, in *dicta*:

---

[9] As noted, Justice Scalia wrote that an interpretation of the salary supplementation statute that included lump-sum payments would render the word "salary" meaningless.  He addressed the import of the exceptions in his *Crandon* concurrence.  Justice Scalia acknowledged that his "interpretation . . . is no more successful than the Government's in giving effect to all the language of the section.  But superfluous exceptions (to 'make assurance doubly sure') are a more common phenomenon than the insertion of utterly pointless language at the very center of the substantive restriction."  *Crandon*, 494 U.S. at 174 (Scalia, J., concurring).

> To convict under [the salary supplementation statute] would seem only to require proof the Government employee received 'salary' in connection with his services from sources other than the Government. There is authority that the term 'salary' used in [the statute] is synonymous with compensation. . . .
>
> The word 'salary' in [the statute] should be construed in light of the purpose of the Act. To hold a Government employee could receive 'pay' in connection with his services to the Government, from sources other than the Government, and if paid in a lump sum (compensation) no law is violated, but if (the unlikely course) paid in equal regular installments (salary) there was a violation, bears no logical relation to the purpose of the Act.

*Gerdel*, 103 F. Supp. at 638 (internal citations omitted).

The government also cites several decisions in which liability for violation of the salary supplementation statute was founded on payment or receipt of one-time, lump-sum amounts, although the question of whether such sums qualified as "salary" was not specifically discussed. *See, e.g.*, *United States v. Oberhardt*, 887 F.2d 790, 793-94 (7th Cir. 1989) (affirming conviction for violation of § 209(a) based on defendant's payment of $200 to government official in exchange for printed list of government contractors; conviction was challenged on basis that payment was not for government "services," rather than on basis that payment was not "salary"); *United States v. Martel*, 792 F.2d 630, 638-39 (7th Cir. 1986) (affirming conviction for violation of § 209(a), where government official's airfare and accommodations to attend a seminar were paid by nongovernmental source; conviction was challenged on basis that jury should not have been instructed to consider § 209(a) as lesser included offense of another charge, which challenge was rejected on the basis of waiver); *see also United States v. Muntain*, 610 F.2d 964, 969-70 (D.C. Cir. 1979) (stating that "it would be possible" that $400 paid to government official as reimbursement for trip to Ireland could qualify as supplementation of salary within meaning

of § 209(a), but reversing conviction because payment was not for official's governmental services, given that official was on leave from his government position at time of trip).

Moreover, as the government sees it, Justice Scalia's interpretation of the salary supplementation statute in his concurrence in *Crandon* is contradicted by the view of the salary supplementation statute that Justice Scalia later expressed in his opinion for the Court in *Sun-Diamond*.  The government observes that, in discussing the gratuity statute, the *Sun-Diamond* Court emphasized the statute's position within a larger universe of laws prohibiting various modes of graft, including the salary supplementation statute, among others.

At one end of the spectrum, the *Sun-Diamond* Court distinguished gratuity from bribery, which, as noted, requires "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act."  *Sun-Diamond*, 526 U.S. at 404-05 (emphasis in original). According to the Supreme Court, a gratuity, unlike a bribe, does not necessarily involve a *quid pro quo* because it "may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405.

At the other end of the spectrum, the Court declined to read the gratuity statute as a "prohibition of gifts given by reason of the donee's office," because "when Congress has wanted to adopt such *a broadly prophylactic criminal prohibition upon gift giving*, it has done so in a more precise and more administrable fashion."  *Id.* at 408 (emphasis added).  As examples of such "broadly prophylactic . . . prohibition[s] upon gift giving," *id.*, the Court cited the salary supplementation statute, § 209(a), as well as prohibitions of the gift of "anything of value" from a bank employee to a bank examiner or from an employer to a union representative.  *See Sun-*

*Diamond*, 526 U.S. at 409.   Of particular relevance here, the Court said, *id.* (emphasis in original):

> With clearly framed and easily administrable provisions such as these on the books imposing gift-giving and gift-receiving prohibitions specifically based upon the holding of office, it seems to us most implausible that Congress intended the language of the gratuity statute—"for or because of any official act performed or to be performed"—to pertain to the office rather than (as the language more naturally suggests) to *particular* official acts.

In *Sun-Diamond*, Justice Scalia did not specifically mention his *Crandon* concurrence. Yet, the government argues that, by describing the salary supplementation statute in *Sun-Diamond* as a "broadly prophylactic criminal prohibition upon gift giving," 526 U.S. at 408, Justice Scalia necessarily renounced the narrow interpretation of the salary supplementation statute that he had previously advanced in *Crandon*.   Indeed, at the motions hearing, the government suggested that the foregoing passage from *Sun-Diamond* expresses a virtual "invitation" to prosecutors to prosecute gifts such as those in *Sun-Diamond* under the salary supplementation statute, rather than the gratuity statute.   And, like the gifts at issue here, the gifts to Secretary Espy in *Sun-Diamond* were not cash and were relatively insubstantial in dollar value, although clearly not *de minimis*.   They included tickets to a tennis tournament, luggage, meals, a framed print, and a crystal bowl, and were worth a total of approximately $5,900.   *See Sun-Diamond*, 526 U.S. at 401.

As discussed, Justice Scalia opined in *Crandon* that compensation must be paid "periodically during the term of federal service, [ ]or calculated with reference to periodic compensation," in order to violate the salary supplementation statute.   *Crandon*, 494 U.S. at 168-69 (Scalia, J., concurring).   If Justice Scalia's reasoning in *Crandon* is correct, the gifts at issue here clearly would not violate the salary supplementation statute.   But, a concurrence is not

binding precedent. *See, e.g.*, *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997). Moreover, I am persuaded by the discussion of the salary supplementation statute in *POGO*, *supra*, 616 F.3d 544, in which the D.C. Circuit held that a payment is not disqualified as a supplementation of or contribution to salary simply because it is a one-time, lump-sum payment. That conclusion is not sufficient to dispose of the issue here, however, because the gifts alleged in this case are not one-time payments of money. Rather, they include gifts of in-kind services and a gift card.

I find further guidance with respect to the scope of the salary supplementation statute in the *POGO* Court's discussion of the statute's intent element, which was the primary focus of its decision. *POGO* was a civil action brought by the United States against a non-profit government watchdog organization and a senior economist at the Interior Department. The organization had given to the economist a $383,600 check, characterized as a "public service award," after information that the economist provided to the organization allowed it to file a successful *qui tam* action against several major oil companies under the False Claims Act. *See POGO*, 616 F.3d at 546. In fact, the payment to the economist represented a third of the organization's recovery as relator in the *qui tam* suit, which the organization allegedly had promised to the economist in a secret agreement. *See id.* The government filed suit against the organization and the economist under the salary supplementation statute, which authorizes (in addition to criminal prosecutions such as this case) actions to recover civil penalties, based on a preponderance-of-the-evidence standard of proof. *See id.* at 547 (discussing 18 U.S.C. §§ 209(a) & 216(b)).

At trial, the district judge refused to submit to the jury an instruction requested by defendants stating that the government was required to prove that the defendants "'*intended* [the payment] as compensation for [the economist's] services as an officer or employee of the United

States.'"   *Id.* at 548 (quoting requested instruction) (emphasis in *POGO*).   Agreeing with the government, the trial court reasoned that the salary supplementation statute does not contain an intent requirement.   *Id.*   The D.C. Circuit disagreed.   Among other things, it perceived an intent requirement in the statutory language requiring that a salary contribution be made or received "'as compensation for' the recipient's services as a government employee."   *Id.* at 550 (quoting statute).   The *POGO* Court said: "This is language of intent.   To conclude that a payment was made 'as compensation,' one must determine the intent of the payor.   To conclude that a payment was made as compensation 'for' something, one must determine what the intended object was."   *Id.*   Moreover, "to conclude that a payment was received 'as compensation for' something, one must determine the intent of the recipient."   *Id.* at 550 n.6.

Furthermore, the *POGO* Court reasoned, by analogy to *Sun-Diamond* and other cases, that a focus on this intent requirement was "'necessary to separate wrongful conduct from otherwise innocent conduct.'"   *Id.* at 550 (citation and some internal quotation marks omitted). In *Sun-Diamond*, among the reasons for interpreting the gratuity statute to require the government to prove a link between a gift and a specific official act, Justice Scalia suggested that the gratuity statute otherwise would criminalize a sports team giving the President a jersey during a White House visit, or a cabinet secretary receiving a complimentary lunch or a souvenir cap for giving a speech—all gifts that clearly are given because of the recipient's official position.   *See Sun-Diamond*, 526 U.S. at 406-07; *see also POGO*, 616 F.3d at 550 (discussing *Sun-Diamond*).   In a similar vein, the *POGO* Court posited: "Without the requirement of an intent element, a parent's monthly checks to a child who works for the government could be construed as violating § 209(a); only the parent's *intent* distinguishes payments to help cover the

rent from payments to subsidize what the parent regards as an insufficient public-sector salary." *POGO*, 616 F.3d at 550 (emphasis in original).[10]

As noted, the government contends that the salary supplementation statute covers virtually anything a government official receives from a non-governmental source by reason of his or her official services.  In the government's view, that is the import of the description of the salary supplementation statute in *Sun-Diamond* as a "broadly prophylactic criminal prohibition upon gift giving."  *Sun-Diamond*, 526 U.S. at 408.  However, Justice Scalia did not cite *Crandon* in *Sun-Diamond*, so the later opinion can hardly be construed as a clear disavowal of his earlier views.  Moreover, although the *Sun-Diamond* Court described the salary supplementation statute as "broadly prophylactic," that does not mean, as the D.C. Circuit recognized in *POGO*, 616 F.3d at 553-54, that it covers anything and everything accepted by a government official.  In the passage at issue, the Supreme Court was at pains to differentiate the gratuity statute, which the Court held requires a linkage between a gift and an official act, from statutes that did not require a link between a gift and a particular official act.  As examples of such "broad[ ]" prohibitions, the Court cited the salary supplementation statute, along with statutes that impose gift bans on

---

[10]  The *POGO* Court also illuminated the distinction between the general intent requirement that it held was required to prove a violation of the salary supplementation statute and the "willful" intent that would elevate a violation to a felony.  It said: "[A] general intent crime requires only that the perpetrator 'kn[ow] that [his act] ha[s] the characteristics bringing it within the scope of the statute,' not that those characteristics make the acts unlawful."  *POGO*, 616 F.3d at 552-53 (citation omitted) (alterations in *POGO*).  "Accordingly, for such crimes, good faith is generally not a defense—notwithstanding that intent to do the things that constitute elements of the offense is required."  *Id.* at 553.  The *POGO* Court contrasted general-intent offenses with "crimes that require that the defendant act 'willfully,'" to which the defendant's good faith is a defense.  *Id.* at 552; *see also id.* at 552 n.10 (stating that, "'in order to establish a 'willful' violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful'") (citation omitted); *id.* at 555 (discussing willfulness requirement of felony version of salary supplementation).

the relationships between bank examiners and bank employees or between union representatives and employers.  *Sun-Diamond*, 526 U.S. at 408-09.  But, the Court's point was that, although the statutes are "broad[ ] . . . prohibition[s]," in that they do not hinge on a link between a gift and a particular official act, they are "clearly framed," "more precise," and "more administrable" in other ways.  *Id*.  The banking and labor organizing prohibitions target specific relationships; the salary supplementation statute targets a particular form or manner of compensation.

As a textual matter, it is salient that the salary supplementation statute prohibits the payment or receipt of "salary, or any contribution to or supplementation of salary, as compensation . . . ."  18 U.S.C. § 209(a).  This is unlike both the bribery statute and the gratuity statute, set forth in the same chapter and title of the U.S. Code, which prohibit the giving or receipt of "anything of value."  18 U.S.C. § 201(b), (c).  Courts "generally seek to respect Congress' decision to use different terms to describe different categories of people or things." *Mohamed v. Palestinian Auth.*, ___ U.S. ___, 132 S. Ct. 1702, 1708 (2012); *accord Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62-63 (2006) (stating the "normal presum[ption]" that "Congress intended its different words to make a legal difference").  Unlike the government, I do not view the *Sun-Diamond* Court's description of the salary supplementation statute as a "broadly prophylactic prohibition upon gift giving" as a signal that the gifts given to Secretary Espy in *Sun-Diamond* violated the salary supplementation statute.  Rather, the Court seemed clearly to say that, without demonstration of at least some connection between the gifts and an official act, the giving of the gifts was not necessarily criminal at all.  *See United States v. Ganim*, 510 F.3d 134, 146 (2d Cir. 2007) (Sotomayor, J.) ("Undergirding the Court's decision in

*Sun-Diamond* was a need to distinguish *legal gratuities* (given to curry favor because of an

official's position) from *illegal gratuities* (given because of a specific act).") (emphasis added).[11]

In a letter submitted by the government after the motion hearing (ECF 61), the

government sought support for its broad interpretation of the "contribution to or supplementation

of salary" in the legislative history of the salary supplementation prohibition.  According to the

government, the statute, as originally codified in 18 U.S.C. § 1914, only prohibited government

officials from receiving "any salary" from a nongovernmental source, and the language

prohibiting receipt of "any contribution to or supplementation of salary" was added when the

statute was recodified as 18 U.S.C. § 209(a) in 1962.  Therefore, the government suggested that

the 1962 enactment expanded the scope of the statute.

---

[11] Despite the government's broad construction of the salary supplementation statute, the government maintains that the salary supplementation statute is not a lesser included offense of the gratuity statute.  But, if the only difference between the salary supplementation statute and the gratuity statute were that the gratuity statute required the demonstration of a link between the gift received and an official act, salary supplementation would be a lesser included offense of gratuity, just as gratuity is a lesser included offense of bribery (which has the additional requirement of a *quid pro quo*).  *See Jefferson*, *supra*, 674 F.3d at 353 (describing gratuity as lesser included offense of bribery).

The case law seems to support the government's view that salary supplementation is not (or at least not necessarily) a lesser included offense of gratuity.  But, the case law so holds because salary supplementation is distinct from the giving or receiving of "anything of value." *See United States v. Raborn*, 575 F.2d 688, 691-92 (9th Cir. 1978) ("Both crimes require proof that a public employee received something of value from an outside source, but section 209 requires proof of an additional element that section 201(c) does not, namely that the public employee received salary or a supplement to salary 'as compensation for services as an employee of the United States.'"); *see also Alfisi*, *supra* 308 F.3d at 153 (concluding that salary supplementation could in some circumstances be a lesser included offense of gratuity, and stating: "[S]ome payments labeled by a payor as salaries might reasonably be charged as bribes, leaving a trier of fact to determine whether they were bribes, the lesser offense of unlawful gratuities, or the even lesser offense of illegal supplementation of salary. . . .  As we read Section 209, the payments in question must bear some or most of the objective indicia of salaries, e.g., being so recorded in business records and so treated for tax purposes by the payor. . . .  [W]here the payments bear none of the indicia of salary but are made with the requisite corrupt intent, they violate Section 201 but not Section 209.").

Upon review of the legislative history, I disagree.  Language prohibiting "contribution to or supplementation of salary" was already present in the prohibition against the payor, as codified in § 1914.  As the report of the House Judiciary Committee on what would become the 1962 enactment reveals, the additional language applied the same language to the prohibition against the recipient and was intended only "to conform with the equivalent prohibition imposed upon the payor."  H. Rep. No. 87-748, at 24 (July 20, 1961).  Moreover, the report states: "The inclusion of the specified exceptions [to liability for salary supplementation] is not to be construed as limiting the right of an employee to receive compensation from private sources except as payment for his services as a government official."  *Id.* at 25.

Nevertheless, as I have already stated, I am persuaded by the POGO Court's view that a payment need not be recurring or periodic to qualify as salary supplementation.  As the D.C. Circuit recognized, such an interpretation is inconsistent with the statutory text and creates a glaring loophole that Congress could not have intended; it is inconceivable that Congress "would have wanted to bar small but periodic payments intended to compensate an employee for his government services, but to permit large single—or irregular—payments that total a far greater sum." *POGO*, 616 F.3d at 560.

Moreover, the case law and other elements of the statutory history suggest that payment of some types of expenses or provision of some kinds of in-kind services can qualify as salary supplementation.  For instance, case law from both the D.C. Circuit and the Seventh Circuit suggests that payment of airfare and accommodations can qualify as salary supplementation under appropriate circumstances. *See Martel*, *supra*, 792 F.2d at 638; *Muntain*, *supra*, 610 F.2d at 969-70.

More closely on point to this case, the salary supplementation statute contains an exception that specifically exempts from its prohibition, under certain circumstances, "the payment of *actual relocation expenses* incident to participation, or the acceptance of same by a participant in an executive exchange or fellowship program in an executive agency."  18 U.S.C. § 209(e) (emphasis added).  This exception was enacted in 1979, *see* Pub. L. 96-174, 93 Stat. 1288 (Dec. 29, 1979), at the request of the governing bodies of the White House Fellows Program and the Executive Exchange Program.  *See* H. Rep. No. 96-674, at 1 (Nov. 29, 1979). According to the House Judiciary Committee report that accompanied the legislation, business executives were frequent participants in these programs, and their employers often reimbursed the participants for the expenses of relocating temporarily to Washington, D.C. to participate. *See id.* at 2.  Congress enacted the exception in response to a Department of Justice opinion that had concluded that such payment of moving expenses would otherwise violate the salary supplementation statute.  *See id.*  It is noteworthy that three earlier Department of Justice opinions apparently had reached the opposite conclusion.  *See id.*  Nevertheless, it would appear that, by enacting the limited exception, Congress acquiesced in the later Department of Justice interpretation that payment of a government official's moving expenses by a non-governmental source ordinarily would violate the salary supplementation statute.  *See, e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (stating that, where "'Congress has not just kept its silence by refusing to overturn [an] administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive").  Therefore, the moving services at issue in Count Eight, if they were intended and understood as compensation

for Ms. Pratt's services as a government official, could qualify as supplementation of salary within the meaning of the statute.

Courts should give effect to Congress's choice in prohibiting the payment as compensation of "salary or any contribution to or supplementation of salary," as set forth in the salary supplementation statute, rather than more broadly barring payment of "anything of value." The spa treatment services, and the gift card for same, appear less salary-like than the moving services at issue in Count Eight. Paying for or providing services that are typically not discretionary, such as moving services, can far more clearly be seen as a substitute for an employee's expenditure of salary than discretionary indulgences, such as spa treatments, which the recipient might not otherwise expend salary to obtain. But, following the guidance of the *POGO* Court to consider the intent requirement of the salary supplementation statute, I conclude that the nature of a particular gift is simply a factor in the overarching question of whether the giver and the recipient intended the gift as a supplementation of salary, to compensate the recipient for her government services. Payments of cash more clearly reveal such an intent—and regular, periodic payments of cash all the more so—than do one-time gifts of in-kind services. As the *Alfisi* Court intuited, *see* 308 F.3d at 153, whether the payor and recipient treat the gift in a manner similar to salary payments (such as the treatment of the gifts in the payor's business records) may also shed light on this issue. Nevertheless, the question is ultimately one of intent, which must be resolved by the fact-finder unless the government submits no evidence at trial from which a rational fact-finder could conclude that the defendant had the requisite intent.

I cannot conclude that, as a matter of law, gifts of spa services can never constitute supplementation of salary. Accordingly, I will also deny the Second Motion to Dismiss.

**Conclusion**

In sum, both of defendants' Motions to Dismiss will be denied.  An Order implementing my ruling follows.[12]


Date:   January 24, 2013                            _____/s/_____
                                                    Ellen Lipton Hollander
                                                    United States District Judge

---

[12] The issuance of this ruling concludes the exclusion of time from the seventy-day period established by the Speedy Trial Act for the period that the Motions to Dismiss were pending and under advisement.  *See* 18 U.S.C. § 3161(h)(1)(D), (H).